UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MRUNMAYI SHRIKANT KALE, et al.,<br>Plaintiffs,<br>v.<br>USCIS, et al.,<br>Defendants. | Case No. 25-cv-10849-VC<br>**ORDER DENYING MOTION TO DISMISS**<br>Re: Dkt. No. 10 |

Through a process called "adjustment of status," the Immigration and Nationality Act provides a pathway for eligible noncitizens already present in the United States to obtain lawful permanent resident status (a "green card") without having to leave the country. The agency in charge of this process, U.S. Citizenship and Immigration Services, has broad discretion to deny adjustment-of-status applications. But the government argues in this case that USCIS has no duty to adjudicate such applications at all and that the INA therefore strips federal courts of jurisdiction to hear claims by plaintiffs seeking to have their applications decided within a reasonable time. Because the government's theory is wrong, the motion to dismiss for lack of jurisdiction is denied.

**I.**

The U.S. Immigrant Investor Program, or EB-5 program, provides a pathway to lawful permanent residence for noncitizens who invest in U.S.-based enterprises that create a certain number of jobs. *See* 8 U.S.C. § 1153(b)(5). Applicants may become eligible for EB-5 visas by making an individual investment or by pooling investments with other foreign investors. *See id.* § 1153(b)(5)(A), (C); 8 C.F.R. § 204.6(g). Pooled investments are managed by "regional

centers," which are regulated by USCIS. *See* 8 C.F.R. § 204.6(g), (m).

Upon making the required investments, an applicant may file an I-526E petition, which, if approved, establishes eligibility for an EB-5 visa. Applicants who are physically present in the United States and whose I-526E petitions were approved then have a choice. They may either return to their home country and finish processing their immigrant visa applications through a U.S. consulate, or they may apply for "adjustment of status" by filing I-485 petitions, which, if approved, would allow them to gain lawful permanent resident status without returning abroad.[1] *See Chung Hou Hsiao v. Hazuda*, 869 F.3d 1034, 1035 (9th Cir. 2017) (citing 8 U.S.C. § 1255(a)).

Pursuant to section 1255(a) of the INA, decisions to grant or to deny applications for adjustment of status are "purely discretionary." *Ayanian v. Garland*, 64 F.4th 1074, 1082 (9th Cir. 2023) (quoting *Kim v. Meese*, 810 F.2d 1494, 1497 (9th Cir. 1987)). Adjustment of status is therefore not guaranteed, regardless of whether the applicant has satisfied the minimum statutory requirements. *See id.* at 1083. Even if adjustment of status is denied, however, an applicant who is eligible for an immigrant visa may still continue the visa application process at a U.S. consulate abroad. *See, e.g.*, *Choe v. I.N.S.*, 11 F.3d 925, 929-30 (9th Cir. 1993).

**II.**

As part of the EB-5 program, Mrunmayi Kale invested $800,000 through a regional center to finance a real estate development project in hopes of obtaining lawful permanent resident status for herself and for her husband, Aditya Kini. *See* Complaint ¶ 1. After satisfying the EB-5 requirements, Kale submitted an I-526E application, which USCIS approved approximately six months later. *Id.* ¶¶ 2-3. On the same day that Kale submitted her I-526E application, Kale and Kini submitted I-485 applications, which remain pending. *Id.* ¶¶ 4-8.

Alleging that the government's delay amounts to an abdication of its duty to adjudicate

[1] Although approval of the Form I-526E is a prerequisite for those seeking adjustment of status through the EB-5 program, applicants may file their I-526E and I-485 applications at the same time. *See* 8 C.F.R. § 245.2(a)(2)(i)(B).

the I-485 applications, Kale and Kini bring claims under the Mandamus Act and section 706 of the Administrative Procedure Act against USCIS and against individual officers of USCIS and the Department of Homeland Security. *Id.* ¶¶ 53-73. They seek an order "requiring that the Defendants and their agents adjudicate Plaintiffs' I-485 applications within the next 30 days." *Id.* at 20. The government moves to dismiss for lack of jurisdiction.

**III.**

District courts generally have jurisdiction to review challenges to federal agency action brought under the Mandamus Act "when there is 'a duty owed to the plaintiff.'" *Pescosolido v. Block*, 765 F.2d 827, 829 (9th Cir. 1985) (quoting 28 U.S.C. § 1361). District courts also generally have jurisdiction over challenges to federal agency action arising under federal law, "unless a statute expressly precludes review." *Gallo Cattle Co. v. U.S. Department of Agriculture*, 159 F.3d 1194, 1198 (9th Cir. 1998).

In the immigration context, "Congress has sharply circumscribed judicial review" of certain agency actions by enacting jurisdiction-stripping provisions. *Patel v. Garland*, 596 U.S. 328, 332 (2022). One of those provisions is section 1252(a)(2)(B) of the INA, which provides:

> Notwithstanding any other provision of law (statutory or nonstatutory) . . . no court shall have jurisdiction to review—
>
> (i) any judgment regarding the granting of relief under section . . . 1255 of this title, or
>
> (ii) any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security, other than the granting of relief under section 1158(a) of this title.

**IV.**

The issue presented is whether section 1252(a)(2)(B)(ii) bars judicial review of the petitioners' claims that the government has violated its duty to adjudicate their I-485 applications. The Ninth Circuit has not opined on the issue, and district courts have reached opposite conclusions. *Compare Khachutorov v. Britten*, 792 F. Supp. 3d 1106 (C.D. Cal. 2025)

(dismissing for lack of jurisdiction), *with Gao v. Mullin*, 2026 WL 948665 (N.D. Cal. Apr. 8, 2026) (concluding that there was jurisdiction).

The Court concludes that section 1252(a)(2)(B)(ii) does not bar review of the petitioners' claims and that USCIS has a non-discretionary duty to decide adjustment-of status applications within a reasonable time. Accordingly, there is jurisdiction to hear this case.

**A.**

"The starting point for any statutory interpretation is the language of the statute itself." *Singh v. Gonzales*, 499 F.3d 969, 977 (9th Cir. 2007). Section 1252(a)(2)(B)(ii) provides that "no court shall have jurisdiction to review . . . any other decision or action of the Attorney General or the Secretary of Homeland Security the authority for which is specified under this subchapter to be in the discretion of the Attorney General or the Secretary of Homeland Security." Therefore, the key question is whether the authority to not decide adjustment-of-status applications is "specified under this subchapter to be in the discretion" of USCIS.

The plain text of section 1252(a)(2)(B)(ii) supports the petitioners. Section 1252(a)(2)(B)(ii) applies only when the authority for the alleged wrongdoing is "specified" by the INA to be in the agency's discretion. And to "specify" means "to mention specifically; that is, the language of the statute in question must provide the discretionary authority." *Spencer Enterprises, Inc. v. United States*, 345 F.3d 683, 689 (9th Cir. 2003) (citation modified) (quoting Black's Law Dictionary 1399 (6th ed. 1990)). A statutory grant of authority must be clear on its face; it cannot be merely "assumed or contemplated." *Kucana v. Holder*, 558 U.S. 233, 243 n.10 (2010) (quoting Webster's New Collegiate Dictionary 1116 (1974)); *see also id.* ("'Specified' is not synonymous with 'implied' or 'anticipated.'").

Here, the government has not identified any provision of the INA specifying that USCIS has the authority to simply not adjudicate adjustment-of-status applications. The government relies on 8 U.S.C. § 1255(a), which states that the status of an eligible noncitizen "may be adjusted by the Attorney General, in his discretion and under such regulations as he may prescribe." But the most natural reading of section 1255(a) is that USCIS has discretion to grant

or to deny adjustment of status and to make regulations governing how it processes such applications—not whether to process those applications at all.[2] To the extent that the government argues that Congress implicitly conferred the authority to decline adjudication of I-485 applications by giving USCIS broad discretion to deny them, precedent makes clear that such an inference of "default authority does not constitute the *specification* required by § 1252(a)(2)(B)(ii)." *See Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004) (holding that section 1252(a)(2)(B)(ii) does not bar review of denials of motions to reopen, even though the statute's silence on that issue implies that USCIS has such discretionary authority).

The statutory context also supports the existence of a non-discretionary duty to adjudicate adjustment-of-status applications. When the plain text of the statute is not entirely clear, courts "do not look at its words in isolation"; they "determine the plainness or ambiguity of statutory text by reference to the text itself, the specific context in which that text is used, and the broader context of the statute as a whole." *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016) (citation modified). Courts must then "turn to the broader structure of the Act and to its object and policy to ascertain the intent of Congress." *Id.* (citation modified).

In 1952, Congress enacted the INA "to establish 'a comprehensive and complete code covering all aspects of admission of aliens to this country.'" *Pacito v. Trump*, 169 F.4th 895, 909 (9th Cir. 2026) (quoting *Elkins v. Moreno*, 435 U.S. 647, 664 (1978)). By consolidating existing immigration laws into a single statutory scheme, Congress "prescribed the terms on which aliens may be admitted to the United States, the conditions under which they may remain within its borders, and the requirements for aliens to become naturalized as U.S. citizens." *Id.* Adjustment of status was an important piece of that puzzle. *See Succar v. Ashcroft*, 394 F.3d 8, 26 (1st Cir.

[2] In fact, the Ninth Circuit, when describing the discretionary nature of such determinations, has seemingly taken for granted that USCIS "must" process adjustment-of-status applications. *See Ayanian v. Garland*, 64 F.4th 1074, 1083 (9th Cir. 2023) ("This allows Ayanian to submit an I-485 application for adjustment of status. USCIS *must* then process the application . . . to determine whether Ayanian has met the various statutory and regulatory requirements for adjustment of status and whether the application should be granted as a matter of discretion." (emphasis added)).

2005) ("The immigration laws about adjustment of status are not a haphazard compilation of provisions; they are a calibrated set of rules that govern an area of national importance."). By creating the process for adjustment of status in the original 1952 Act, Congress reformed the prior system in which noncitizens awaiting lawful permanent resident status "had to leave the country and apply for an immigrant visa at a consulate abroad." *Elkins*, 435 U.S. at 667. That change substantially reduced disruptions to qualified applicants' lives by enabling them to go through the immigration process "without incurring the expense and inconvenience of traveling abroad." USCIS Policy Manual, vol. 7, pt. A, ch. 1 (June 26, 2026).

Since the INA's passage, Congress has enacted various amendments to advance certain national interests. The creation and refinement of the EB-5 program is one example. *See* Immigration Act of 1990, Pub. L. 101-649, § 121, 104 Stat. 4978, 4989-90 (1990); EB-5 Reform and Integrity Act of 2021, Pub. L. 117-103, div. BB, 136 Stat. 1070, 1070-1109 (2022). By allocating immigrant visas through the EB-5 program to eligible noncitizens who make job-creating investments in U.S.-based enterprises, Congress intended "to stimulate the economy and create jobs through foreign capital investment." *Zhang v. USCIS*, 344 F. Supp. 3d 32, 40 (D.D.C. 2018), *aff'd* 978 F.3d 1314 (D.C. Cir. 2020).

From that context, it is clear that both visa allocations and adjustment of status are important tools through which Congress sets immigration policy. By allocating visas, Congress creates certain incentives for noncitizens seeking lawful permanent resident status; and by permitting adjustment of status, Congress makes it easier for noncitizens to act on those incentives. Both mechanisms work in tandem to better achieve immigration-related policy goals, so it is unreasonable to infer that, by enacting section 1255(a), Congress intended to give unfettered discretion to USCIS to simply not adjudicate adjustment-of-status applications at all. That would allow USCIS to undermine without any justification a longstanding feature of the INA.

Admittedly, Congress did confer broad discretion to deny adjustment of status. *See Ayanian*, 64 F.4th at 1083. But denying an application and refusing to adjudicate it are not the

same. A denial makes clear that the applicant should continue the visa process abroad, if they so choose, whereas a failure to adjudicate keeps an applicant in limbo, unsure of how to proceed. That difference matters to applicants like Kale and Kini, who might prefer to receive a denial than to live in uncertainty. *See* Opp. to Motion to Dismiss, Dkt. No. 11, at 4 ("This delay has caused Plaintiff concrete harm including, prolonged uncertainty regarding immigration status, inability to finalize permanent residency, and associated personal and professional limitations."); *see also Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1070 (N.D. Cal. 2014).

A 2000 amendment to the INA aimed at reducing immigration backlogs further supports the idea that Congress intended for adjustment-of-status applications to be processed. In that amendment, Congress funded infrastructure improvements for the processing of "immigration benefit applications" and expressed its "sense . . . that the processing of an immigration benefit application should be completed not later than 180 days after the initial filing of the application." 8 U.S.C. § 1571(a)-(b); *id.* § 1572(2) (defining "immigration benefit application" to include adjustment-of-status applications). Although statutory language setting forth the "sense of Congress" is not legally binding, the fact that Congress expressed any goal at all as to the number of days an agency should take to process an adjustment-of-status application cuts in favor of the conclusion that the obligation to process them is non-discretionary.[3]

Under the government's theory, Congress established a comprehensive statutory scheme

---

[3] That understanding is consistent with the legislative history of the 2000 amendment. In discussing H1B visas, a Senate report explained that "entirely unreasonable administrative delays" in immigration processing impacted the United States' ability to attract skilled workers from other countries. S. Rep. No. 106-260, at 1-3, 23 (2000). The report recognized the importance of finding ways to avoid forcing noncitizens to leave the country while their visa applications were pending. Specifically, the report explained that the bill "addresses inordinate delays" by allowing noncitizens on a temporary visa (but whose employers sponsored them for immigrant visas) to "obtain an extension . . . so the individual can stay in the United States until a decision is made on his or her case—rather than forcing the person to leave the country." *Id.* at 10. That senators were thinking about how to minimize the burdens imposed on noncitizens waiting for lawful permanent resident status explains why Congress ultimately chose to include adjustment-of-status applications in the final definition of "immigration benefit application." *See* 8 U.S.C. § 1572(2).

for adjustment of status in furtherance of certain policy goals, yet it also intended to give agencies unreviewable discretion over whether to process those applications at all. That is implausible. If Congress had intended to confer unfettered discretion to USCIS to decline adjudication of adjustment-of-status applications, it would have said so more clearly. And if Congress had intended to bar judicial review of USCIS's failure to act, it would have said that more clearly too.

**B.**

The government contends that *Patel v. Garland*, 596 U.S. 328 (2022), and *Zia v. Garland*, 112 F.4th 1194 (9th Cir. 2024), require courts to interpret section 1252(a)(2)(B)(ii) expansively. In *Patel*, the Supreme Court considered whether the section 1252(a)(2)(B)(i)'s bar against judicial review of "any judgment regarding the granting of relief" applied to factual findings underlying an agency's denial of relief. *See* 596 U.S. at 331. The Supreme Court held that it did because "judgment" means "any authoritative decision," and a factual finding in support of a denial of relief is an authoritative decision "regarding the granting of relief." *Id.* at 337-39. In *Zia*, the Ninth Circuit applied *Patel* to decide whether the BIA's grant or denial of a good-faith marriage waiver was covered by section 1252(a)(2)(B)(ii). Concluding that it was, the panel reasoned that "*Patel*'s interpretation of 'any judgment' in subsection (i) . . . equally applies to 'any other decision or action' in subsection (ii)" in that "'any other decision or action' expansively . . . cover[s] all determinations made in support of a grant of discretionary relief under subsection (ii)." *Zia*, 112 F.4th at 1200.

As relevant to section 1252(a)(2)(B)(ii), *Patel* and *Zia* stand for the proposition that predicate actions or decisions made in support of other actions or decisions—the authority for which the INA specifies to be in the agency's discretion—are not subject to judicial review. But that has no bearing here. Kale and Kini do not allege that the delays at issue are decisions made in support of other decisions specified to be in USCIS's discretion. In its briefing, the government insists that the delays in processing Kale's and Kini's applications are "routine processing delays that constitute discretionary actions by the agency." Reply Brief, Dkt. No. 12,

at 4. But there is no record evidence to support the government's characterizations, and on a motion to dismiss, the Court takes well-pled allegations in the complaint as true. *See Whisnant v. United States*, 400 F.3d 1177, 1179 (9th Cir. 2005).

The other court of appeals cases cited by the government are similarly inapposite. In *Geda v. Director of USCIS*, 126 F.4th 835 (3d Cir. 2025), for instance, the petitioners challenged the agency's "adjudication hold policy," under which USCIS held certain applications in abeyance in response to actual demand for visas exceeding the limited number of available visas. *See id.* at 839-40. The petitioners in that case were initially projected to become eligible to receive EB-2 visas and to have their I-485 applications adjudicated during the 2022 fiscal year. *Id.* at 840. But after USCIS learned that there were no available EB-2 visas left, it adjusted its projections, and the petitioners' applications were held in abeyance for an uncertain amount of time. *Id.* at 841. The Third Circuit affirmed the district court's dismissal for lack of jurisdiction under section 1252(a)(2)(B)(ii), reasoning that the decision to hold the petitioners' applications in abeyance was made pursuant to a policy that the agency had discretion to promulgate under section 1255(a). *Id.* at 844. Other circuits adopted the same approach in similar challenges. *See Kale v. Alfonso-Royals*, 139 F.4th 329, 334-35 (4th Cir. 2025); *Cheejati v. Blinken*, 106 F.4th 388, 394-95 (5th Cir. 2024); *Thigulla v. Jaddou*, 94 F.4th 770, 775-77 (8th Cir. 2024); *Kanapuram v. Director of USCIS*, 131 F.4th 1302, 1307 (11th Cir. 2025). In all those cases, the delays at issue were attributable to an agency policy that USCIS adopted to facilitate compliance with statutory limits placed on available visas. By contrast, Kale and Kini do not allege that the delays here were implemented pursuant to any policy—let alone one aimed at enabling the lawful allocation of visas.

Finally, the government relies on *Khachutorov v. Britten*, 792 F. Supp. 3d 1106 (C.D. Cal. 2025). In that case, the petitioners claimed that USCIS unlawfully delayed the adjudication of their I-485 applications by a number of months. *Id.* at 1110. The district court noted that the petitioners had failed "to point to any authority showing a specific, unequivocal command" for the government to adjudicate their applications within a reasonable time and then concluded that

section 1252(a)(2)(B)(ii) stripped the court of jurisdiction because "government decisions regarding the pace of review of an application are generally discretionary." *Id.* at 1114. But that is unpersuasive for the reasons explained above. *See Medina-Morales v. Ashcroft*, 371 F.3d 520, 528 (9th Cir. 2004) (emphasizing that section 1252(a)(2)(B)(ii) "refers not to discretionary decisions" in general, but only to conduct "the authority for which is *specified* under the INA to be discretionary"). Moreover, even the court in *Khachutorov* recognized that section 1252(a)(2)(B)(ii) would arguably not bar judicial review of cases alleging delays that are tantamount to refusals to act because doing so would sanction "the perpetual delay of governmental obligations." *See Khachutorov*, 792 F. Supp. 3d at 1114 & n.3 (quoting *Mohsenzadeh v. Kelly*, 276 F. Supp. 3d 1007, 1014 (S.D. Cal. 2017)). That acknowledgment seems to contradict the court's earlier conclusion that jurisdiction was lacking and suggests that the court was conflating jurisdiction with the merits. It is entirely possible that the delays alleged in *Khachutorov* were not so extreme as to constitute "perpetual delay," meaning that the petitioner was not entitled to relief on the merits. But that is a distinct issue. For the purpose of determining whether section 1252(a)(2)(B)(ii) applies, the Court need only decide for now whether the choice to adjudicate an adjustment-of-status application is specified by the INA to be purely discretionary. How lengthy a delay must be to state a claim for an unreasonable delay tantamount to a withholding of that mandatory duty is a question to be resolved on the merits.

**V.**

The motion to dismiss for lack of jurisdiction is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 11, 2026

VINCE CHHABRIA
United States District Judge